PEOPLE OF the STATE OF ILLINOIS,
Plaintiff-Appellant,

v.

KERR–McGEE CHEMICAL
CORPORATION,
Defendant-Appellee.

and

CITY OF WEST CHICAGO, a Municipal
Corporation, Plaintiff-Appellant,

v.

KERR–McGEE CHEMICAL CORPORA-
TION, a Delaware Corporation,
Defendant-Appellee.

Nos. 81–1110, 81–1152.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1981.

Decided May 4, 1982.

Rehearing and Rehearing En Banc
Denied Aug. 2, 1982.

Anne Rapkin, Asst. Atty. Gen., Environmental Control Div., Tyrone C. Fahner, Atty. Gen., Chicago, Ill., Bruce R. Kelsey, West Chicago, Ill., for plaintiffs-appellants.

John C. Berghoff, Jr., Chicago, Ill., for defendant-appellee.

Before SPRECHER and WOOD, Circuit Judges, and BROWN,* Senior District Judge.

---

* Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. The Atomic Energy Commission (AEC) was abolished by the Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801–5891. In its place Congress created the Nuclear Regulatory Commission (NRC), which assumed the regulatory functions of the AEC, and the Energy Research and Development Administration, which took responsibility for the promotion and develop-

SPRECHER, Circuit Judge.

These cases concern approximately forty-three acres of land which defendant Kerr-McGee Chemical Corporation owns and operates within the limits of the City of West Chicago, Illinois. The site consists of eight acres containing twenty-one factory and other buildings, twenty-seven acres used for waste disposal, and eight acres separating the factory and disposal areas. Since at least World War II, the facility has been used by Kerr-McGee and its predecessor companies to produce various compounds derived from radioactive natural ores. These activities generated large quantities of solid and liquid wastes.

Since 1956 the facility has been licensed by the Atomic Energy Commission (AEC) and its successor, the Nuclear Regulatory Commission (NRC).[1] Kerr-McGee ceased all operations on the site in 1973 but continued, under license from the NRC, to possess and store thorium ores there.[2] Since 1975 Kerr-McGee has been working, at the NRC's direction, to formulate a plan for decommissioning and stabilizing the site. Both the State of Illinois and the City of West Chicago have commented on the proposed plan, and the NRC is currently preparing an environmental impact statement on the project.

On April 28, 1980, the State of Illinois filed a complaint against Kerr-McGee in the Circuit Court of Illinois for DuPage County. The complaint alleged that Kerr-McGee's operation and maintenance of the site violate the Illinois Environmental Protection Act, Ill.Rev.Stat. ch. 111½, § 1001 et seq., and other state statutes pertaining to the disposal of hazardous wastes. On June 13, 1980, the City of West Chicago filed suit in

ment of atomic energy. In this opinion we use the terms Atomic Energy Commission (AEC) for periods before 1974 and Nuclear Regulatory Commission (NRC) for periods after 1974. The term "the Commission" is used to refer to either body.

2. The Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq., defines thorium as a nuclear "source material", 42 U.S.C. § 2014(z), which is subject to regulation by the Commission.

the same court, charging Kerr-McGee with maintenance of a public nuisance, unlawful condemnation of public property, and violation of state and city regulations.

Kerr-McGee petitioned to have both cases removed to federal court. With regard to the City of West Chicago's case, the grounds for removal were that the complaint stated a controversy arising under the laws of the United States and that there was diversity of citizenship between the parties. Removal of the state's suit was based solely on the argument that the complaint raised a federal question.

The city did not contest removal of its suit. The state, however, moved to remand to state court, arguing that it had pleaded no federal cause of action. Denying the state's motion for remand, the district court found that the federal regulatory scheme under the Atomic Energy Act has preempted state regulation of radioactive waste disposal. Since the state's complaint necessarily involved the interpretation of federal law, the district court held that the case was properly removed. *Illinois v. Kerr-McGee Chemical Corp.*, No. 80 C 2776 (N.D. Ill. Aug. 15, 1980).

Kerr-McGee subsequently moved to dismiss both complaints. The district court granted the motions, finding that federal law conferred exclusive jurisdiction upon the NRC to regulate radiation hazards and, therefore, preempted state and local legislative and administrative regulatory schemes. *Illinois v. Kerr-McGee Chemical Corp.*, Nos. 80 C 2776 and 80 C 3357 (N.D.Ill. Jan. 8,

1981). These appeals followed. Because we decide the state's and the city's appeals on different grounds, we will consider each case separately.

## I

### *Illinois v. Kerr-McGee Chemical Corp., No. 81–1110*

The State of Illinois argues that the case was improperly removed to federal court and that federal law has not preempted the state regulatory scheme at issue. We find that the state's case against Kerr-McGee was improperly removed to federal court. We have no occasion, therefore, to consider the question of preemption with regard to the state's case.

### A

Under 28 U.S.C. § 1441(a) and (b), any or all defendants may remove a civil action brought in state court to federal court if the action is founded on a claim "arising under" federal law or if none of the defendants are citizens of the state where the action was brought.[3] Removal jurisdiction is thus keyed to the federal courts' original jurisdiction over federal question and diversity suits.[4] The general rule is that a case can be removed from state court only if the federal court would have had original jurisdiction over the action had it been brought there initially. *Arkansas v. Kansas & Texas Coal Co.*, 183 U.S. 185, 189, 22 S.Ct. 47, 48, 46 L.Ed. 144 (1901); *First National Bank v. Aberdeen*

**3.** 28 U.S.C. § 1441 provides:

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served

as defendants is a citizen of the State in which such action is brought.

(c) Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

**4.** 28 U.S.C. § 1331 defines the original jurisdiction of the federal courts over civil actions involving questions of federal law. 28 U.S.C. § 1332 performs the same function for suits in which there is diversity of citizenship.

*National Bank*, 627 F.2d 843, 848 (8th Cir. 1980). Because there can be no diversity of citizenship between the State of Illinois and Kerr-McGee,[5] we will examine only the removability of claims "arising under" federal law.

The current removal statute, 28 U.S.C. § 1441, is heir to a large body of case law that began with interpretations of the 1887 removal statute. Act of Mar. 3, 1887, ch. 373, 24 Stat. 552. That case law embodies a number of principles used by federal courts in deciding whether a case involves a federal question warranting removal. First among these principles is that the existence of a federal question must appear on the face of the plaintiff's complaint. *See Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127, 94 S.Ct. 1002, 1003, 39 L.Ed.2d 209 (1974); *Gully v. First National Bank*, 299 U.S. 109, 112–13, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936); *Tennessee v. Union and Planters' Bank*, 152 U.S. 454, 460, 14 S.Ct. 654, 656, 38 L.Ed. 511 (1894); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249 (7th Cir. 1981). Thus a defendant's assertion of an issue of federal law in the pleadings or in the petition for removal does not create a federal question. *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003, 39 L.Ed.2d 209 (1974); *Arkansas v. Kansas & Texas Coal Co.*, 183 U.S. 185, 188, 22 S.Ct. 47, 48, 46 L.Ed. 144 (1901); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249 (7th Cir. 1981). A plaintiff who has both federal and state causes of action may choose to ignore the federal claims and pursue only the state claims in state court. *See Pan American Petroleum Corp. v. Superior Court*, 366 U.S. 656, 663, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961); *Great Northern Railway Co. v. Alexander*, 246 U.S. 276, 282, 38 S.Ct. 237, 239, 62 L.Ed. 713 (1918); *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976). The defendant is entitled to have the case removed to federal court, however, if the plaintiff is attempting to avoid having an essentially federal claim adjudicated in a federal forum merely by artfully drafting the complaint in terms of state law. *See Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249 (7th Cir. 1981); *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976). Nevertheless, the federal question must be an essential element of the plaintiff's complaint to provide grounds for removal. *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127, 94 S.Ct. 1002, 1003, 39 L.Ed.2d 209 (1974); *Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249 (7th Cir. 1981); *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976).

A problematic aspect of removal jurisdiction is that it is derivative, that is, a case can be removed to federal court only if it was properly before the state court. If the state court lacks jurisdiction over either the subject matter or one of the parties, the federal court cannot acquire jurisdiction on removal. This is true even if the case properly could have been brought in federal court in the first instance. *See Lambert Run Coal Co. v. Baltimore & Ohio Railroad Co.*, 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922); *Washington v. American League of Professional Baseball Clubs*, 460 F.2d 654, 658 (9th Cir. 1972); *Koppers Co. v. Continental Casualty Co.*, 337 F.2d 499, 501 (8th Cir. 1964). As others have noted, this is exactly the type of "legal *tour de force*" that lay persons abhor. *See, e.g., Washington v. American League of Professional Baseball Clubs*, 460 F.2d 654, 658 (9th Cir. 1972). However, the rule is so well-entrenched now that it would take legislative action to dislodge it. 14 Wright, Miller & Cooper, Federal Practice and Procedure § 3722, at 576 (1976).[6]

---

**5.** It is well-established that a state is not considered a citizen of any state for the purposes of diversity jurisdiction. Thus there can be no diversity jurisdiction when a state is a real party in interest to a lawsuit. *See State Highway Comm'n v. Utah Constr. Co.*, 278 U.S. 194, 200, 49 S.Ct. 104, 106, 73 L.Ed. 262 (1929); 1A Moore's Federal Practice ¶ 0.161[1], at 525 (2d ed. 1981).

**6.** The derivative jurisdiction doctrine is a problem for Kerr-McGee because the company has argued both that the case was properly re-

One final principle to be considered is that the removal statute should be construed narrowly and against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941); *Arkansas v. Kansas & Texas Coal Co.*, 183 U.S. 185, 188, 22 S.Ct. 47, 49, 46 L.Ed. 144 (1901); *La Chemise Lacoste v. Alligator Co.*, 506 F.2d 339, 344 (3d Cir. 1974), *cert. denied*, 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975). This has been the policy of Congress since at least 1887,[7] and it is evident in successive versions of the removal statute. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941). The Supreme Court has been loathe to expand the federal courts' removal jurisdiction and has continually refused to recognize exceptions to the general principles discussed above. *See, e.g., Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002,

1003, 39 L.Ed.2d 209 (1974). Indeed, almost all Supreme Court decisions expounding the law of removal have been in the context of holding that removal was unwarranted.[8] With these principles in mind, we turn to consideration of Illinois' complaint to determine if a federal claim has been asserted.

Illinois' complaint alleges that Kerr-McGee's operation of the West Chicago facility violates state law by improperly maintaining and disposing of solid and liquid hazardous wastes, by creating a water pollution hazard, by failing to register the site in accordance with state regulations, and by creating a public nuisance. These claims are grounded in the Illinois Environmental Protection Act, Ill.Rev.Stat., ch. 111½, § 1001 *et seq.*, its predecessor statute, the Illinois Refuse Disposal Act, Ill.Rev.Stat., ch. 111½, § 471 *et seq.* (repealed by P.A. 76–2429, § 50, effective July 1, 1970),[9] the Illinois Public Nuisance Act, Ill.Rev.Stat.,

moved to federal court and that federal law governing nuclear hazards has completely preempted the state regulatory scheme at issue here. If Kerr-McGee is correct that the case was properly removed to federal court, it must be that the state court had jurisdiction and state law has not been preempted. If, on the other hand, state law has been preempted, then the case was never properly before the state court and the federal court cannot have jurisdiction on removal. Because we find it unnecessary to reach the issue of preemption with respect to this particular case, we are able to avoid this tangled web of legal casuistry.

7. In the removal statute of 1887, Act of Mar. 3, 1887, ch. 373, 24 Stat. 552, Congress clearly reduced the federal courts' removal jurisdiction after twenty years of expansion. In 1867, in response to the bitter sectional animosity engendered by the Civil War, the removal statute had been amended to allow for removal of suits to federal court if it appeared that either party would be unable to obtain justice in the state court because of "prejudice or local influence." Act of Mar. 2, 1867, ch. 196, 14 Stat. 558 (amending Act of July 27, 1866, ch. 288, 14 Stat. 306). The 1875 removal statute, Act of Mar. 3, 1875, ch. 137, 18 Stat. 470, had further expanded removal jurisdiction by permitting *either* party to remove a case to federal court if there was a federal question or diversity of citizenship. In contrast, the 1887 removal statute evinces a conscious purpose on the part of Congress to limit federal removal jurisdiction by allowing only *defendants* to have cases removed to federal court. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 106–07 and

n.2, 61 S.Ct. 868, 871 and n.2, 85 L.Ed. 1214 (1941) (quoting H.R.Rep.No.1078, 49th Cong., 1st Sess. 1 (1887)).

8. *See, e.g., Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974); *Pan American Petroleum Corp. v. Superior Court*, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); *Gully v. First Nat'l Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *General Inv. Co. v. Lake Shore & Michigan Southern Ry. Co.*, 260 U.S. 261, 43 S.Ct. 106, 67 L.Ed. 244 (1922); *Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co.*, 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922); *Great Northern Ry. Co. v. Alexander*, 246 U.S. 276, 38 S.Ct. 237, 62 L.Ed. 713 (1918); *Arkansas v. Kansas & Texas Coal Co.*, 183 U.S. 185, 22 S.Ct. 47, 46 L.Ed. 144 (1901); *Tennessee v. Union and Planters' Bank*, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894). The only case we have found in which the Supreme Court appears to expand the removal jurisdiction of the federal courts is *Avco Corp. v. Aero Lodge 735, Int'l Ass'n. of Machinists & Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). The reasons we feel *Avco* does not govern this case are discussed *infra*, at n.10.

9. The state has pleaded a cause of action under a statute that is no longer in force in an apparent attempt to reach alleged violations that may have occurred before the Illinois Environmental Protection Act was enacted. *See* Count V of the State of Illinois' Complaint.

ch. 100½, § 26, regulations of the Illinois Pollution Control Board and the Illinois Department of Public Health, and common law nuisance. Nowhere in its complaint does the state rely on or even allude to federal statutes or case law. Nor can we find any basis for concluding that the state has artfully drafted its complaint in order to defeat removal. *See Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976). We find, therefore, that the state's complaint pleads only state causes of action and does not raise a federal question justifying removal of the case to federal court.

B

■ Our decision that Illinois has not stated a federal claim warranting removal of this case to federal court does not end our inquiry, however. Kerr-McGee argues that, by raising the issue of preemption, it has created a federal question that must be decided in federal court regardless of the claims appearing on the face of the state's complaint. Kerr-McGee contends that preemption is different from defenses on the merits in that the question of whether or not state law is preempted depends entirely on the interpretation of federal statutes and cases. If preemption appears to be a determinative element in the case, Kerr-McGee argues, the action can be characterized as one "arising under" federal law, and removal is therefore proper under 28 U.S.C. § 1441.

We cannot accept Kerr-McGee's argument. The company is correct in saying

that if state law is preempted by federal law, a plaintiff may seek a remedy in federal court. We do not agree, however, that a defendant can have a state law claim removed to federal court merely by uttering the word preemption. No such result has been authorized by statute, nor has it been sanctioned by the Supreme Court. Although the Court has never faced the issue directly, certain opinions have suggested that the defense of federal preemption does not create a federal question for the purpose of removal. *See, e.g., Gully v. First National Bank*, 299 U.S. 109, 116, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936). Indeed, in *Bailey v. Logan Square Typographers*, 441 F.2d 47 (7th Cir. 1971), a suit for the wrongful appropriation of intellectual property, this circuit found that the issue of preemption was a defense to the claim, rather than a part of the claim itself. Such a federal defense to a state claim was held not to be a sufficient basis for the exercise of removal jurisdiction. In the course of his opinion, then Judge Stevens said, "It is well settled that a federal prohibition against the prosecution of a state claim is not a basis for removal to the federal court." *Id.* at 51–52 (quoting *Gully v. First National Bank*, 299 U.S. 109, 116, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936)).

Kerr-McGee has cited a number of cases in which removal of suits to federal court was permitted because state law had been preempted.[10] To the extent that these cases are in conflict with our decision here, we decline to follow them. Rather, we reaffirm our decision in *Bailey* and join at

10. *See, e.g., Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801, 803 (2d Cir. 1973); *Bailey v. First Fed. Sav. & Loan Ass'n*, 467 F.Supp. 1139, 1141 (C.D.Ill.1979); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n*, 405 F.Supp. 819, 823 (N.D.Ill.1975); *Sweeney v. Morgan Drive Away, Inc.*, 394 F.Supp. 1216, 1218 (D.Colo. 1975); *Sylgab Steel & Wire Corp. v. Strickland Transp. Co.*, 270 F.Supp. 264, 271 (E.D.N.Y. 1967).

Kerr-McGee places great reliance on the Supreme Court's opinion in *Avco Corp. v. Aero Lodge 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). *Avco* held that because federal substantive law was controlling on the issue of whether an employer could enforce a

no-strike clause in a collective bargaining agreement, the suit was properly removed to federal court. We do not read *Avco* to say, however, that a defendant can always have a case removed to federal court merely by arguing that state law has been preempted. First, the Supreme Court has not utilized *Avco* to expand the federal courts' removal jurisdiction. *See, e.g., Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974). Second, the Court's own criticism of its decision in *Avco* causes us to question the applicability of the case outside the area of labor relations. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 244–45, 90 S.Ct. 1583, 1589, 26 L.Ed.2d 199 (1970). Finally, we do not think the Supreme Court in *Avco* intended to effect a wholesale

least two other circuits and a number of district courts in holding that the issue of federal preemption is merely a defense to state law claims.[11] We can see no reason for treating a defense of federal preemption differently than any other defense based on federal law, and a defense to a state law claim cannot be a ground for removal. *Accord, Johnson v. First Federal Savings & Loan Association*, 418 F.Supp. 1106, 1109 (E.D.Mich.1976). As the Supreme Court stated in *Arkansas v. Kansas & Texas Coal Co.*, 183 U.S. 185, 22 S.Ct. 47, 46 L.Ed. 144 (1901), "When Federal questions arise in cases pending in the state courts, those courts are competent, and it is their duty, to decide them." *Id.* at 190–91, 22 S.Ct. at 49. We know of nothing in the intervening years to cause us to doubt the state court's ability to apply federal law here.

We hold, therefore, that *Illinois v. Kerr-McGee Chemical Corp.*, No. 81–1110, was improperly removed to federal court. The order of the district court denying remand of the state's case is Reversed, and the case is Remanded to the district court with instructions to remand it to the state court.[12]

## II

### City of West Chicago v. Kerr-McGee Chemical Corp., No. 81–1152

■ The City of West Chicago appeals the dismissal of its suit on the ground of preemption, arguing that federal law does not preempt the city's authority to enforce local ordinances and to abate public nuisances.[13] For the reasons set forth below, we find that the city's suit against Kerr-McGee is not barred by federal preemption.

### A

■ Although the basic rules governing whether or not federal law has preempted state law in a particular area are relatively easy to understand, the application of these rules to specific situations is difficult. One begins with the presumption that an act is valid if done in exercise of a state's legitimate police powers. *See, e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Kelly v. Washington*, 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3 (1937). This is particularly true when a state acts to promote public health and safety. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). Thus preemption of the states' police powers by federal statute must not be assumed, but exists only if " 'that was the clear and manifest purpose of Congress,' " *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146,

---

expansion of the federal courts' removal jurisdiction without so much as mentioning over eighty years of judicial precedent to the contrary. *See* cases cited in note 8 *supra*. *Accord, First Nat'l Bank v. Aberdeen Nat'l Bank*, 627 F.2d 843, 852–53 (8th Cir. 1980).

**11.** *See, e.g., First Nat'l Bank v. Aberdeen Nat'l Bank*, 627 F.2d 843, 853 (8th Cir. 1980); *Washington v. American League of Professional Baseball Clubs*, 460 F.2d 654, 660 (9th Cir. 1972); *Turner v. Bell Fed. Sav. & Loan Ass'n*, 490 F.Supp. 104, 105 (N.D.Ill.1980); *Connecticut v. Levi Strauss & Co.*, 471 F.Supp. 363, 367 (D.Conn.1979); *Nevada v. King*, 463 F.Supp. 749, 751 (D.Nev.1979); *Johnson v. First Fed. Sav. & Loan Ass'n*, 418 F.Supp. 1106, 1109 (E.D.Mich.1976).

**12.** Because the state's case should not have been removed from state court to federal court, the district court's consideration of the issue of preemption with regard to the state's case was improper.

**13.** Kerr-McGee had the city's suit removed from state to federal court on the grounds that the complaint raised a federal question and that there is diversity of citizenship between the parties. We express no opinion on the federal question issue, for it appears that removal was proper under the federal court's diversity jurisdiction. Kerr-McGee is a Delaware corporation with its principal place of business in Oklahoma. The City of West Chicago is an Illinois municipal corporation. It is well-settled that, for the purposes of determining diversity jurisdiction, a corporation is deemed a citizen of its state of incorporation and of the state where it has its principal place of business, and a municipal corporation is a citizen of the state which creates it. *See* 1A Moore's Federal Practice ¶ 0.161[3.–1], at 581–82 (2d ed. 1981).

1152, 91 L.Ed. 1447 (1947)); *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission,* 659 F.2d 903, 919 (9th Cir. 1981), or if there is a direct conflict between federal and state law that cannot be reconciled. *Kelly v. Washington,* 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3 (1937). Courts are not to seek out conflicts where none necessarily exist, *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960), and even when federal law is found to be preemptive, state law is invalid only to the extent that it clearly has been preempted. *See Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission,* 659 F.2d 903, 919 (9th Cir. 1981).

■ Congress may evince a purpose to preempt state law in three ways. First, Congress may expressly state that federal authority over a particular subject is to be exclusive. Second, federal preemption may be inferred from the language of the statute, the legislative history, or the objects of the federal regulatory scheme. Finally, if it is impossible to comply with both federal and state law, federal law will prevail and state law must yield. *See Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1146–47 (8th Cir. 1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).[14] With these factors in mind, we turn to an examination of the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.,* and the extent to which it has preempted state and local law.

**B**

The history of the regulation of atomic energy and its hazards in the United States has been explored thoroughly elsewhere.[15] Here we shall include only a brief recital of the pertinent facts. The original Atomic Energy Act of 1946, Pub.L.No.79–585, 60 Stat. 755, created a government monopoly over atomic energy and radioactive materials, primarily because of their use in weapons development. By 1954, however, Congress had recognized the value of the peaceful uses of atomic energy. Congressional policy behind the Atomic Energy Act of 1954, therefore, was to encourage private development of that form of energy. 42 U.S.C. § 2011. The federal government's monopoly over nuclear materials was to be shared only with those who complied with the strict licensing scheme administered by the Atomic Energy Commission. Not until 1959 did Congress create a role for the states in the regulation of atomic energy and its hazards. What is now 42 U.S.C. § 2021 clarified the areas of state and federal responsibility and set out the circumstances under which the Commission would relinquish its authority over certain aspects of atomic energy regulation.[16]

■ The section of the current Atomic Energy Act most relevant to the question

---

14. Similar principles of federal preemption have applied since the birth of the republic. As Alexander Hamilton said in The Federalist:

> The principles established in a former paper teach us that the States will retain all *preexisting* authorities which may not be exclusively delegated to the federal head; and that this exclusive delegation can only exist in one of three cases: where an exclusive authority is, in express terms, granted to the Union; or where a particular authority is granted to the Union, and the exercise of a like authority is prohibited to the States; or where an authority is granted to the Union, with which a similar authority in the States would be utterly incompatible.

The Federalist No. 82 (A. Hamilton) (Modern Library Edition) at 534–35 (footnote omitted).

15. *See, e.g., Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1147–49 (8th Cir. 1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972); Murphy & LaPierre, *Nuclear "Moratorium" Legislation in the States and the Supremacy Clause: A Case of Express Preemption,* 76 Colum.L.Rev. 392, 394–415 (1976); Estep & Adleman, *State Control of Radiation Hazards: An Intergovernmental Relations Problem,* 60 Mich.L.Rev. 41, 42–44, 58 (1961).

16. It should be noted that the Atomic Energy Act is unlike most federal statutes that preempt state law. In the usual case, federal law steps in to preempt an area traditionally reserved to state regulation. The regulation of atomic energy and its hazards, on the other hand, began as the exclusive province of the federal government. Only gradually have the states been allowed to play a part. Analysis of the preemptive effect of other federal legislation is, therefore, not very helpful in resolving the issue here.

of federal and state regulation of the hazards associated with atomic energy is 42 U.S.C. § 2021. Section 2021(b) provides for agreements between the states and the Commission under which the state can assume much of the Commission's regulatory authority "for the protection of the public health and safety from radiation hazards." 42 U.S.C. § 2021(b). Because Illinois has not entered into such an agreement, it appears that the Commission has surrendered none of its authority to regulate nuclear materials or their hazards within the state. Section 2021(k), however, states that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). Thus, regardless of whether or not a state has entered into a § 2021(b) agreement with the Commission, the state retains its authority to regulate non-radiation hazards.[17]

The legislative history of the bill that contained what became 42 U.S.C. § 2021 sheds further light on federal and state responsibilities in the area of atomic energy regulation. In the Senate report, the committee recognized "the dangers of conflicting, overlapping, and inconsistent standards in different jurisdictions, to the hinderance [sic] of industry and jeopardy of public safety." S.Rep.No.870, 86th Cong., 1st Sess., reprinted in [1959] U.S.Code Cong. & Ad.News 2872, 2879. The committee made it clear that:

> It is not intended to leave any room for the exercise of dual or concurrent jurisdiction by States to control radiation haz-

ards by regulating byproduct, source, or special nuclear materials. The intent is to have the material regulated and licensed either by the Commission, or by the State and local governments, but not by both.

Id. The same reports' description of the purpose of subsection (k), however, made it equally clear that the states were to retain their authority to regulate non-radiation hazards.

> Subsection k. provides that nothing in the new section 274 [§ 2021] shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards. This subsection is intended to make it clear that the bill does not impair the State authority to regulate activities of AEC licensees for the manifold health, safety, and economic purposes other than radiation protection. As indicated elsewhere, the Commission has exclusive authority to regulate for protection against radiation hazards until such time as the State enters into an agreement with the Commission to assume such responsibility.

Id. at 2882–83.

The NRC's regulations establish that the Commission's view of its own jurisdiction is consistent with the language of the statute and the Senate report. The Commission repeatedly claims exclusive authority "to license or regulate, from the standpoint of radiological health and safety, byproduct, source, and special nuclear material or production and utilization facilities" in non-agreement states. 10 C.F.R. § 8.4(j). The

---

17. We recognize that other sections of the Atomic Energy Act may appear to conflict with the retention of limited regulatory authority by the states as mandated in 42 U.S.C. § 2021(k). See, e.g., 42 U.S.C. § 2114(a)(1) (giving the Commission the power to protect the public from both the radiological and non-radiological hazards of certain byproduct materials). Such conflicts are inevitable in a complicated and much-amended statute such as the Atomic Energy Act. We are guided, however, by the Supreme Court's admonition that "[s]tatutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent

law and the policies that inspired ostensibly inconsistent provisions." Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970). Furthermore, repeals by implication are disfavored. If statutory provisions are capable of co-existence, courts must give effect to each. Administrator, Federal Aviation Administration v. Robertson, 422 U.S. 255, 265–66, 95 S.Ct. 2140, 2147, 45 L.Ed.2d 164 (1975). Recognizing these principles, we believe that our interpretation of § 2021 correctly states the intent of Congress without doing violence to other sections of the Atomic Energy Act.

Commission does not state, however, that its authority extends to the regulation of non-radiation hazards.

The few cases interpreting the rights of the states and the federal government to regulate atomic energy and its related hazards support the view that the Atomic Energy Act does not totally preempt state law as to non-radiation hazards. In *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), a nuclear-fueled electric generating plant on the banks of the Mississippi River was operated under a permit from the AEC. Despite this permit, the State of Minnesota attempted to impose more stringent limitations on radioactive effluents from the plant than were imposed by the AEC. In finding Minnesota's regulations preempted by federal law, the Eighth Circuit held that a state has no authority to regulate radiation hazards unless it has entered into an agreement pursuant to 42 U.S.C. § 2021(b). *Id.* at 1148–49. Because radioactive discharges from a nuclear power plant clearly constituted a radiation hazard, regulation of those effluents was the exclusive responsibility of the AEC.[18]

In a more recent opinion, *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission*, 659 F.2d 903 (9th Cir. 1981), the Ninth Circuit agreed with the Eighth Circuit in *Northern States* that Congress intended the Atomic Energy Act to preempt state regulation of radiation hazards, but further held that the states retained the authority to regulate other matters. *Id.* at 923. The Ninth Circuit rejected challenges to a California statute that required utilities to submit three alternate sites for proposed power plants and that declared a temporary moratorium on the construction of any new nuclear power plants. The three-site rule and the moratorium provision were held to be legitimate exercises of the state's authority to regulate the generation of electricity in the

public interest. *Id.* at 925. Moreover, the statute was found not to impinge on the exclusive federal control of radiation hazards. *Id.* at 925–26. California's regulatory scheme was therefore not preempted by federal law.

 Thus, an examination of the Atomic Energy Act, the relevant sections of its legislative history, NRC regulations, and the two major cases, reveals that the Commission has exclusive authority to regulate radiation hazards associated with the materials and activities covered by the Atomic Energy Act unless the state has agreed to assume some of the responsibility for that regulation. Even absent such an agreement, however, the state retains the right to regulate non-radiation hazards. In line with the opinions in *Northern States* and *Pacific Legal Foundation*, we hold that the Atomic Energy Act has expressly and impliedly preempted regulation by the states of the radiation hazards associated with nuclear materials. Regulation of non-radiation hazards by the states or their political subdivisions has not, however, been preempted. We think it unwise to formulate in abstract terms the distinction between radiation hazards and non-radiation hazards. We must, therefore, examine closely the facts of this case to determine whether the City of West Chicago's suit against Kerr-McGee is barred by federal preemption.

### C

The city's complaint alleges violations of state law and city ordinances by Kerr-McGee with regard to two distinct problems. Counts I through V concern the buildings and grounds at Kerr-McGee's West Chicago facility. Counts VI and VII relate to the alleged dumping of industrial byproducts by Kerr-McGee or its predecessors at various places throughout the City of West Chicago. Because these two sets of allegations raise different factual and legal

---

**18.** Although the Supreme Court merely affirmed *Northern States* without opinion, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), it subsequently reasserted its adherence to the

holding of that case in *Train v. Colorado Pub. Interest Research Group*, 426 U.S. 1, 14–17, 96 S.Ct. 1938, 1944–1945, 48 L.Ed.2d 434 (1976).

considerations, we will consider them separately.

### 1

■ Counts I through V of the city's complaint allege a number of dangerous conditions existing at Kerr-McGee's factory site in West Chicago:

10. The said current conditions which exists [*sic*] on the factory area are as follows:

a) open pits filled with refuse and chemicals

b) holes in floors two through four of building nine, averaging three feet in diameter

c) loose glass in windows

d) broken glass on pavement below windows

e) boards off windows

f) animal litter scattered throughout the buildings

g) fallen walls, debris, abandoned equipment and chemicals

h) fallen, collapsed, and sagging roofing

i) scattered empty beer cans and bottles

11. The said current conditions include accessibility by the public through and over fences, and no lighting exists in a majority of the buildings.

City of West Chicago's Brief, App. at 7. The city alleges that these conditions constitute a public nuisance and render the buildings "unsafe structures" in violation of city ordinances.[19] Nothing in the city's complaint mentions the radiation hazards that may exist at Kerr-McGee's West Chicago facility, nor is there any attempt to directly regulate radioactive materials. The prayer contained in each of the five Counts requests only the imposition of a civil penalty and that the violation be corrected and the nuisance abated "in compliance with the

rules, regulations, procedures and ordinances of all interested governmental entities." *See, e.g., id.* at 8.

Kerr-McGee argues that the city's suit necessarily impinges upon the Commission's authority to regulate the radiation hazards associated with the West Chicago facility. We do not agree. None of the alleged violations directly involved radiation hazards. Nothing in the record indicates that the measures necessary to remedy the alleged violations would interfere with NRC regulation of radiation hazards. However, to the extent that it is established on remand that an *actual* conflict exists between the Commission's authority and the city's suit, the Commission must, of course, prevail.

Given our ruling that the authority of state and local governments to regulate non-radiation hazards has not been preempted by federal law, the city has set forth actionable claims under common law and city ordinances in Counts I through V of its complaint and may proceed with its suit concerning Kerr-McGee's West Chicago facility.

### 2

■ Counts VI and VII of the city's complaint allege that at some point certain industrial byproducts were removed from Kerr-McGee's West Chicago facility and deposited by Kerr-McGee or its predecessors as fill in various places throughout the City of West Chicago. The city has identified seventy-five such off-site dumps where the public right to use and enjoy the property has been infringed. The city claims the dumping of hazardous material as fill constitutes reverse condemnation of public property and the creation of a public nuisance. We do not believe the doctrine of reverse condemnation applies in this instance[20] and consider only the city's nuisance claim.

---

19. The city claims authority to bring this suit under various Illinois statutes granting municipalities the right to define, prevent, and abate nuisances, Ill.Rev.Stat. ch. 24, § 11–60–2; to cause the demolition, repair, or enclosure of dangerous and unsafe buildings, Ill.Rev.Stat. ch. 24, § 11–31–1; and to seek an injunction to

force compliance with municipal ordinances in the interest of public health and safety, Ill.Rev. Stat. ch. 24, § 11–31–2.

20. A reverse or inverse condemnation action is one brought by a landowner whose land has been appropriated in some fashion by a public

██ We cannot determine from the record whether these off-site dumps pose radiation or non-radiation hazards. We will assume for the purposes of this discussion that both types of hazards are involved. If the off-site dumps indeed constitute a radiation hazard, the NRC would appear to have exclusive authority to regulate that hazard. Under 42 U.S.C. § 2280, the Commission is authorized to seek a permanent or temporary injunction against a person who, in the judgment of the Commission, "has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this chapter, or any regulation or order issued thereunder." *Id.* The language of the section clearly authorizes the granting of an injunction directed at past conduct as well as continuing conduct. This conclusion is reinforced by the NRC's own regulations, which state that the Commission may seek an injunction or other court order against any violation of the Atomic Energy Act or regulations issued thereunder. 10 C.F.R. § 20.601. These provisions, coupled with the NRC's exclusive authority to regulate radiation hazards, lead us to believe that the NRC could exercise control over the radiation hazards associated with the off-site dumps.

The city's brief and the record in this case, however, include a series of memoranda generated by the NRC in which the Commission asserts that it has no authority to require Kerr-McGee to clean up the off-site contamination that has occurred in the City of West Chicago. *See* City of West Chicago's Brief, App. at 27–36. It is unclear from the record why the Commission believes it lacks such authority over these unlicensed dumps, although there is some indication that the dumping may have occurred before the Atomic Energy Act and its regulatory scheme took effect. *See* City of West Chicago's Brief, App. at 27, 31–32. Despite the NRC's asserted lack of authority to require clean-up of the off-site dumps, the memoranda indicate that any action which is taken affecting the off-site materials must be done pursuant to a license issued by the NRC.

Kerr-McGee argues that exclusive NRC jurisdiction over radiation hazards and the fact that any clean-up would require a Commission license mean that only the NRC has any authority over the dump sites and that state remedies are preempted. Therefore the fact that the NRC might be unable to require any clean-up of the off-site contamination is unimportant. We disagree. When Congress gave the Commission exclusive authority to regulate radiation hazards, it did not intend to create a situation in which some hazards could go unremedied. Congress' concern was to avoid dual regulation of radiation hazards. *See* S.Rep.No.870, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad. News 2872, 2879. We can find no expression of a congressional intent to leave certain hazards beyond the scope of any control whatsoever.[21] Indeed, such a result would be absurd given the enduring and potentially destructive hazards posed by radioactive materials.[22]

---

agency for public use without any compensation being paid to the landowner. Kerr-McGee is not a public agency with any eminent domain powers, nor has there been any appropriation of land for public use. The doctrine of reverse or inverse condemnation, therefore, is not appropriately applied in this suit. *See, e.g., Dep't of Transp. v. Shaw,* 36 Ill.App.3d 972, 981–82, 345 N.E.2d 153, 160 (1976), *aff'd in part and rev'd in part,* 68 Ill.2d 342, 12 Ill.Dec. 177, 369 N.E.2d 884 (1977); Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of the Legislative Power,* 19 Stan.L. Rev. 727, 730–31 (1967); Mandelker, *Inverse Condemnation: The Constitutional Limits of*

*Public Responsibility,* 1966 Wis.L.Rev. 3, 3–6 (1966).

**21.** We find support for our position in the recent case of *Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908 (10th Cir. 1981). There the Tenth Circuit approved the imposition of tort liability for property damage that had occurred as a result of the escape of a quantity of plutonium from a nuclear plant site. At least one reason for the court's ruling was that the NRC has no power to award compensation to a victim of such an incident, yet such a remedy is clearly needed. *Id.* at 920.

**22.** It is entirely possible that the NRC has exclusive authority to regulate any disposition of

On the basis of the record that is before us, it is impossible to determine whether the NRC does indeed have jurisdiction to order the clean-up of the off-site materials. On remand, the district court must decide this question based on its findings as to the nature of the materials at the off-site locations and, if relevant, the dates when the dumpings occurred. To the extent that the court finds that the NRC is without power to require the clean-up of the hazards of the off-site dumps, whether radiological or non-radiological, the City of West Chicago can maintain its suit against Kerr-McGee for the alleged nuisance. To the extent that the NRC does have the authority to regulate the radiation hazards associated with such sites, the city's attempts at independent regulation are, of course, preempted. If the off-site dumps pose any non-radiation hazards, the city may pursue its own remedies only to the extent that they do not conflict with NRC regulation of radiation hazards.

The order of the district court dismissing the city's suit is, therefore, Reversed and the case of *City of West Chicago v. Kerr-McGee Chemical Corp.*, No. 81–1152, is Remanded to the district court for further proceedings consistent with this opinion.

---

these materials that actually occurs, but is without authority to *require* that action be taken to protect the public health and safety from these alleged hazards absent a licensing request. The city's only recourse then might be to begin the potentially costly clean-up itself under license from the NRC. If Kerr-McGee or one of its predecessors is responsible for the off-site contamination, such a result would be intolerable. Kerr-McGee cannot avoid answering the city's suit by retreating behind so uncertain a claim of federal preemption.

We note with approval the statements made at oral argument by Kerr-McGee's counsel to

the effect that Kerr-McGee has offered to assist in the clean-up of the off-site dumps. Such benevolent expressions of intent are to be encouraged and may be helpful in settlement negotiations, but they are irrelevant to our determination of whether or not the city's nuisance action has been preempted by federal law.